UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---
CITIBANK, N.A.,

                Plaintiff,

      -against-

SHULEM FRIEDMAN and MIRIAM FRIEDMAN,

                Defendants.

**MEMORANDUM & ORDER**

**23-CV-02420 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Citibank, N.A. ("Citibank" or "Plaintiff") brings several claims against Defendants Shulem and Miriam Friedman ("Friedmans" or "Defendants") for allegedly pursuing a fraudulent scheme to misuse and overcharge nine personal credit accounts with Citibank. (*See* Am. Compl. (Dkt. 16) ¶¶ 8-10, 19-24.) Citibank seeks to recover $1,738,035.63 in damages from the Defendants' alleged overcharging scheme and asserts claims for (i) fraudulent misrepresentation; (ii) false pretenses; (iii) actual fraud with respect to misrepresentations and fraudulent conduct; (iv) civil conspiracy; (v) breach of contract; and (vi) unjust enrichment. (*See generally id.*) Defendants move to dismiss Plaintiff's Amended Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (*See* Not. of Mot. (Dkt. 20); Defs.' Mot. to Dismiss ("Mot.") (Dkt. 20-5).)

For the following reasons, the Defendants' motion is GRANTED in part and DENIED in part.

I. BACKGROUND[1]

Defendants Shulem and Miriam Friedman opened nine credit card accounts (the "Credit Accounts") with Plaintiff Citibank.

---

[1] The following facts are taken from the Amended Complaint and, for the purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub.*

(*See* Am. Compl. ¶ 8.) Upon opening these accounts, Defendants, through Citibank's credit agreements, agreed to use the accounts only for consumer purposes, to pay all amounts due, make monthly minimum payments, and not use their accounts for unlawful transactions. (*Id.* ¶¶ 29, 31, 33.) They also agreed to a total credit limit on all accounts of $184,000. (Am. Compl. ¶ 34; *see also* Credit Agreements at 2.) Initially, Defendants "were good customers;" they honored their credit agreements and made timely payments on their Credit Accounts for consumer goods. (Am. Compl. ¶ 9.) After several years, however, Defendants undertook a fraudulent scheme to "drastically increase and swiftly charge up the balances of their Credit Agreements before Citibank could identify their illicit manipulations." (*Id.* ¶ 10.) This resulted in overcharged amounts, totaling over $1,738,035.63 across all nine Credit Accounts. (*Id.*)

Specifically, Defendants used their Credit Accounts to make large purchases, including some in excess of $50,000, at eyewear companies, as well as for shipping and related business expenses, at times in excess of $15,000. (*Id.* ¶¶ 11-14.) To obtain excess credit above authorized limits and to avoid default in doing so, Defendants used four primary mechanisms to carry out their fraudulent scheme. (*Id.* ¶ 24.)

First, Defendants disputed the large transaction charges made on their Citibank Credit Accounts, triggering Citibank to automatically apply a conditional credit in the amount of the disputed transaction on the relevant Credit Account pending investigation

---

*Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022). The Amended Complaint is also deemed to include documents incorporated in it by reference and that are "integral." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The court considers the exhibits that Defendant submitted with its motion—the Citibank credit card agreements and notices of account closures—to be integral to the Complaint. (*See* Ex. B to Cwibeker Decl. ("Credit Agreements") (Dkt. 20-3); Ex. C to Cwibeker Decl. ("Notices of Account Closures") (Dkt. 20-4).)

2

of the dispute. (*Id.* ¶ 24(a).) When Citibank applied the conditional credit, the disputed transaction was no longer reflected against the Defendants' credit limit, thereby allowing Defendants to continue spending on the account in excess of their credit limit. (*Id.*) Citibank alleges that Defendants disputed charges aimed at obtaining extensions of credit in excess of their credit limit on 66 known occasions, resulting in a fraudulent credit extension of $2,480,184.69. (*Id.*)

The second mechanism by which Defendants carried out their fraudulent scheme was to file false payment disputes with their banks after submitting payments to their Credit Accounts. (*Id.* ¶ 24(b).) Here, Defendants made payments to their Credit Accounts using their accounts at different banks, including a $149,157.53 payment using their Valley National Bank account and a $67,425.40 payment using their JP Morgan Chase account, and then disputed those same payments with the Defendants' paying banks. (*Id.*) By first making the payment to Citibank, Defendants obtained additional borrowing capability under their Credit Accounts. When they later disputed the payments with the payor banks, this triggered the payor banks to recall the initial payment, allowing Defendants to also re-use the same funds with their payor banks. Citibank asserts that Defendants disputed payments with payor banks on four known occasions. (*Id.*)

Third, on 115 known occasions, Defendants used false or fraudulent account numbers to submit large payments on their Credit Account balances. (*Id.* ¶ 24(c).) All the payments were returned on or after June 7, 2018, as Citibank was unable to process any payments because the account numbers listed on each payment did not exist or were not owned by Defendants. (*Id.*)

Finally, on at least eight occasions, Defendants submitted their false payments right before the billing cycle causing the Credit Accounts to reflect a zero amount owed for the period, even though the payments were ultimately rejected. (*Id.* ¶ 24(d).) This

3

additional mechanism allowed Defendants to manipulate the timing of their fraudulent payments to prevent Defendants' accounts "from being flagged as in default for failure to make monthly payments, and prevent collection." (*Id.*)

As a result of the fraudulent scheme, Citibank commenced this action by filing a complaint in this district on March 29, 2023 and asserting causes of action for (1) fraudulent misrepresentation; (2) false pretenses; (3) actual fraud – misrepresentation; (4) actual fraud – fraudulent conduct; (5) civil conspiracy; (6) breach of contract; and (7) unjust enrichment. (*See generally* Complaint (Dkt. 1).) Plaintiff shortly thereafter amended its complaint, raising all of its previous causes of action, but adding additional allegations as support. (*See generally* Am. Compl.) Defendants' motion to dismiss was fully briefed on January 12, 2024. (*See* Scheduling Order (Dkt. 19); *see also* Mot.; Pl.'s Opp. to Mot. ("Opp.") (Dkt. 20-6); Defs.' Reply ("Reply") (Dkt. 20-7).)

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.* In deciding a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Fink v. Time Warner*

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). However, allegations that "are no more than conclusions [] are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Further, dismissal for failure to state a claim is appropriate if it is clear from the face of the complaint that a claim is barred as a matter of law. *Biocad JSC v. F. Hoffman-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019).

### III. DISCUSSION

Defendants seek to dismiss the Amended Complaint in its entirety, raising three primary arguments for dismissal: (1) that this action is barred by New York's statute of limitations; (2) that Plaintiff's fraud and unjust enrichment claims are impermissibly duplicative; and (3) that the Amended Complaint fails to state a claim for which relief can be granted. (*See generally* Mot.) The court addresses each argument below.

#### A. Statute of Limitations

As a threshold matter, both parties agree that New York's statute of limitations applies to this action. (*See* Mot. at 4; Opp. at 8.) "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998). "Choice of law provisions typically apply to only substantive issues, and statutes of limitations are considered 'procedural' because they are deemed as pertaining to the remedy rather than the right." *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416, 927 N.E.2d 1059, 1061 (2010). Thus, while the Credit Agreements state that "[f]ederal law and the law of South Dakota govern the terms and enforcement of this Agreement," the court applies New York's statutes of limitations to Citibank's claims. (Credit Agreements at 10.)

Defendants assert that this action is barred by the three-year statute of limitations pursuant to New York Civil Practice and Rules

("CPLR") § 214-i[3] because the most recent date complained of in the Amended Complaint occurred on April 3, 2019, and Citibank commenced this lawsuit on March 29, 2023, almost a year after the statute of limitations under CPLR § 214-i expired. (Mot. at 4-5.) Citibank disagrees, arguing that CPLR § 214-i does not apply to this action, and instead under CPLR §§ 213(2) and (8), the applicable statute of limitations is six years. (Opp. at 7-10.) Under either provision, Plaintiff argues that Defendants' fraudulent conduct justifies equitable tolling of the relevant statute of limitations. (*Id.* at 13-14.)

CPLR § 213 provides a six-year statute of limitations for most actions, including those governed by contract or based on fraud. Under CPLR § 213(2), "an action upon a contractual obligation or liability, express or implied, except as provided in section two hundred thirteen-a or two hundred fourteen-i of this article or article 2 of the uniform commercial code or article 36-B of the general business law," is subject to the six-year statute of limitations. Similarly, under CPLR § 213(8), "an action based upon fraud" is subject to "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."

CPLR § 214-i, by contrast, mandates that "[a]n action arising out of a consumer credit transaction where a purchaser, borrower or debtor is a defendant must be commenced within three years[.]"

---

[3] The Consumer Credit Fairness Act ("CCFA") was signed into law on November 8, 2021. *See Murphy v. PHG Funding LLC*, No. 656158/2021, 2023 WL 4290351, at *2 (N.Y. Sup. Ct. June 30, 2023). As part of that law, the statute of limitations was reduced from six years to three years for actions arising out of consumer credit transaction filed on or after April 7, 2022. *Id.; see also* Practice Commentaries to CPLR § 214-i.

### 1. Whether CPLR § 213 or § 214-i Applies

Here, the relevant question is whether the Friedmans' transactions must be considered consumer transactions per the Credit Agreements, or whether the allegations that the transactions were business transactions involving large eyewear purchases (Count VI) and based upon fraud (Counts I-IV) are sufficient to apply the longer statute of limitations under CPLR § 213.

With respect to Citibank's fraud claims, the court concludes that claims based on fraud are governed by CPLR § 213(8) and are thus subject to the six-year statute of limitations. Defendants in their Reply cite no authority for their position that CPLR § 214-i applies to fraud claims, instead arguing that because the statute does not differentiate between contract or fraud claims, it must apply to both so long as those claims "*aris[e] out of* a consumer credit transaction." (Reply at 2.)

While true that CPLR § 214-i does not differentiate between contract and fraud claims, the general statute of limitations provision, CPLR § 213, provides that all actions are to be commenced within six years, except where there is a limitation "specifically prescribed by law," such as in CPLR § 214-i. CPLR § 213(1). Under CPLR § 213(8), where an action is based upon fraud, it must be afforded the longer statute of limitations period.

On its face, CPLR § 213 is unambiguous, and includes specific carve outs for certain actions, including contract actions arising out of consumer credit transactions. *See* CPLR § 213(2). That the statute does not also include a similar carve out for cases based on fraud makes clear the Legislature's intent to limit the shorter statute of limitations only in subsection two, and not in all actions enumerated in CPLR § 213. Accordingly, the court finds that actions based upon fraud are subject to the six-year statute of limitations set forth in CPLR § 213(8).

Regarding Plaintiff's contract claim, Citibank does not dispute that CPLR § 214-i generally applies to consumer credit transactions, *see* CPLR § 213(2), but instead argues that Defendants' transactions cannot be considered consumer transactions as defined in CPLR § 105(f). (Opp. at 8-10.)

Here, it is undisputed that the Credit Agreements specify that each of the Defendants nine Credit Accounts were to be used for consumer purposes only. (*See* Credit Agreements at 2 (noting "Consumer Purposes" under "Account Use").) However, the mere fact that the Defendants agreed to use their accounts only for consumer purposes does not automatically render their actual transactions "consumer." *See, e.g., Matthew Bender & Co. v. Shore,* 447 N.Y.S.2d 39, 40 (N.Y. App. Div. 3d Dep't 1982) (finding purchase of lawbooks by attorney for his "professional endeavors does not fall within the scope of a consumer credit transaction"). Indeed, Citibank contemplated this exact scenario, notifying Defendants in the agreements that "[i]f you do use your Account for business purposes, this Agreement still applies, and you must pay us for those Transactions. You have to pay us for any damages and/or expenses resulting from that use. In addition, we may also close your Account." (*See* Credit Agreements at 2.) And, as made clear by the filing of the lawsuit, Citibank seeks to recover the expenses resulting from what it argues were business expenses.

CPLR § 105(f) defines a consumer credit transaction as "a transaction wherein credit is extended to an individual and the money, property, or service which is the subject of the transaction is *primarily for personal, family or household purposes.*" CPLR § 105(f) (emphasis added).

Here, taking the allegations in the Amended Complaint as true, Citibank has sufficiently alleged that many of the transactions at issue were business expenses in violation of the Agreements. Specifically, Citibank alleges that Defendants followed a "common

scheme" by opening accounts and making regular payments to "build the appearance" that they were good customers, which then enabled them to commit the alleged fraud. (Am. Compl. ¶ 19.) For example, Citibank alleges that in the year 2017, Defendant Shulem Friedman's Credit Account ending in -3136 was riddled with purchases from eyewear companies, including in excess of $50,000. (*Id.* ¶¶ 10-13.) And only three transactions on that account in 2017 did not involve purchases from eyewear companies; instead, two of the three transactions involved what Citibank alleges were business charges to the United Parcel Service ("UPS") in excess of $3,000. (*Id.* ¶ 14.) With regard to Defendant Miriam Friedman's Credit Account ending in -2412, Citibank submits that in 2017 and 2018, that account was used exclusively for commercial transactions with eyewear companies, shipping companies, and other business entities. (*Id.* ¶ 17 (listing business transactions dated January 9, 2017 through June 7, 2018).) Only one of the transactions listed for this account was for an amount under $10,000, and the most expensive single transaction was at the eyewear company ABB Concise for $60,000. (*Id.*) Other exemplar transactions include a $31,003.70 purchase at CallMax Solutions USA which Citibank submits is an "outsourcing staffing solutions service for businesses" and a FedEx transaction totaling $18,703.19. (*Id.; see also id.* ¶¶ 39, 53, 64, 79, 90, 98, 108.)

Having found that Plaintiff's claims are subject to CPLR § 213, the court now determines the earliest date for which the court may consider the Defendants' conduct and Citibank's claims, and whether equitable tolling is warranted.

    2. Equitable Tolling

Under CPLR § 213(2), the statute of limitations for breach of contract claims is six years and "begins to run from the day the contract was breached, not from the breach was discovered, or

9

should have been discovered." *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997).

For causes of action based upon fraud, however, those claims must be commenced within six years from the date of accrual or within two years from the time the fraud is or should have been discovered, whichever is greater. *See* CPLR § 213(8); *see also Neuman v. Garcia*, No. 20-CV-10723 (PKC), 2022 WL 4448722, at *11 (S.D.N.Y. Sept. 23, 2022).

Additionally, the doctrine of equitable estoppel is available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act, and the party acted with reasonable diligence throughout the period to be tolled." *Daisley v. FedEx Ground Package Sys., Inc.*, No. 08-CV-4063 (JG) (LB), 2008 WL 5083009, at *3 (E.D.N.Y. Dec. 1, 2008), *aff'd*, 376 F. App'x 80 (2d Cir. 2010); *see also Neuman*, 2022 WL 4448722, at *11 ("Where fraud or concealment of the existence of a claim prevents an individual from timely filing, equitable tolling of a statute of limitations is permitted until the fraud or concealment is, or should have been, discovered by a reasonable person in the situation."). Plaintiff bears the burden of establishing equitable tolling is warranted. *See Daisley*, 2008 WL 5083009, at *3.

The earliest allegation of fraud alleged in the complaint is December 30, 2015 and Citibank argues that the fraud continued through April 3, 2019. (*See* Am. Compl. ¶¶ 24(c)(i), (vi).) Thus, Citibank was required to bring the instant complaint within the greater of six years from the date the cause of action first accrued (December 30, 2021) or two years from the time the plaintiff discovered the fraud. CPLR § 213(8). As Defendants correctly note, notices of account closures were sent to Defendants on June 15,

2018. (*See* Notices of Account Closures at ECF 2-7.)[4] It is reasonable to infer that Citibank knew or should have known of the alleged fraud by that date and thus, under the two-year discovery period, was required to bring the instant lawsuit by June 15, 2020. Given that the six-year accrual date is greater than the two-year discovery period, the court concludes that Citibank was required to bring the instant lawsuit by December 30, 2021.

As Citibank did not bring the instant lawsuit until March 29, 2023, and thus after the statute of limitations expired, the court must either find that conduct prior to March 29, 2017 (six years prior to the commencement of this lawsuit) is time-barred, or whether equitable tolling is warranted under the circumstances to cover all alleged conduct.

The court declines to apply the extraordinary remedy of equitable tolling at this juncture. Where Citibank knew or had reason to know of the Defendants' fraud by June 15, 2018, but did not bring the instant lawsuit until almost three years later, the court is hesitant to conclude that Citibank has met its burden to find equitable tolling is warranted. However, should discovery reveal additional support for equitable tolling, Plaintiff is free to re-raise these issues after the close of discovery. *See, e.g., Neuman,* 2022 WL 4448722, at *11 (S.D.N.Y. Sept. 23, 2022).

Accordingly, the court finds that Plaintiff's claims relating to Defendants' conduct prior to March 29, 2017 is barred by the statute of limitations.

---

[4] Additional notices were sent on December 11, 2018, but specify that the accounts were closed at the request of the Defendants. (*See id.* at ECF 8-13.) To the extent these accounts are not the same ones for which notices were sent in June 2018, the court does not consider them in this analysis as it is unclear whether the accounts were closed at the request of the Defendants for some other reason unrelated to the claims at issue here.

### B. Whether Plaintiff's Claims are Duplicative

Defendants also move to dismiss Plaintiff's fraud and unjust enrichment claims as duplicative of its breach of contract claim. (*See* Mot. 10-16.) Defendants in so arguing rely on New York law whereas Plaintiff asserts that South Dakota law must govern this analysis. (*See id.* at 10; Opp. at 14.)

#### 1. Fraud Claims

While true that the Credit Agreements specify that South Dakota law governs the contracts, (*see* Credit Agreements at 10), "fraud claims sound in tort, not contract, so the contractual choice of law provision in the [Credit Agreements] is inapplicable to the fraud causes of action." *J.A.O. Acquisition Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 638 (N.Y. Sup. Ct. 2001), *aff'd*, 293 A.D.2d 323, 739 N.Y.S.2d 821 (2002).

Thus, for a "choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." *J&R Multifamily Grp., Ltd. v. U.S. Bank N.A.*, No. 19-CV-1878 (PKC), 2019 WL 6619329, at *4 (S.D.N.Y. Dec. 5, 2019).

Section 13 of the Credit Agreements states that "[f]ederal law and the law of South Dakota govern the terms and enforcement of this Agreement." (Credit Agreements at 10.) Numerous courts have found similar language to be insufficiently broad to encompass tort claims. *See J&R Multifamily Grp., Ltd.*, 2019 WL 6619329, at *4 (collecting cases); *see also Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-CV-8987 (GHW), 2019 WL 1244294, at *16 (S.D.N.Y. Mar. 18, 2019) (finding provisions stating that the "Parties agree that [the settlement agreement] shall in all respects be interpreted, enforced, and governed under the laws of Tennessee]" and that the purchase agreement "shall

12

be governed by and construed in accordance with the laws of the State of New York" do not encompass plaintiffs' tort claim).

While the parties agreed to apply South Dakota law for the terms of the Credit Agreements, fraud plainly falls outside of said agreements. Accordingly, the agreements' choice-of-law provisions are inapplicable to Citibank's fraud claims, and the court therefore applies New York's choice-of-law rules to determine the appropriate state law.

Here, the court must first determine whether there is an actual conflict between New York's and South Dakota's laws regarding the coexistence of fraud and breach of contract causes of action. *Flatiron Acquisition Vehicle, LLC*, 2019 WL 1244294, at *16. If the relevant states' laws do not conflict, New York will apply its own law. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006).

Contrary to Plaintiff's assertion, the court finds that there does not appear to be a material difference in the laws of New York and South Dakota as both permit the coexistence of fraud and breach of contract claims so long as the fraud is separate and distinct from the breach of contract. (*See* Opp. at 15.) *Compare Deutz & Crow Co. v. S. Dakota State Cement Plant Comm'n*, 466 N.W.2d 631, 636-37 (S.D. 1991) ("Conduct that is merely a breach of contract is not a tort" and thus the fraud contemplated must be "extraneous to the contract" rather than a "fraudulent non-performance of the contract itself"), *with McKernin v. Fanny Farmer Candy Shops, Inc.*, 574 N.Y.S.2d 58, 59 (N.Y. App. Div. 2d Dep't 1991) ("It is well settled that where . . . a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie."), *and Graubard Mollen Dannett & Horowitz v. Moskovitz*, 612 N.Y.S.2d 39, 40 (N.Y. App. Div. 1st Dep't 1994), *aff'd,*

86 N.Y.2d 112, 653 N.E.2d 1179 (1995) (affirming lower court's denial of summary judgment on fraud claims where the allegations of fraud were extraneous to the contract between the parties).

Moreover, both states look to the same elements when analyzing whether fraud has been proven. *Compare Stabler v. First State Bank of Roscoe*, 865 N.W.2d 466, 477 (S.D. 2015), *with Spector v. Wendy*, 881 N.Y.S.2d 465, 467 (N.Y. App. Div. 2d Dep't 2009).

Finding no material conflict between the two states' laws, the court will apply New York law to Plaintiff's fraud claims.

To prove fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996). However, where a fraud claim is based on an alleged breach of contract, there must be allegations of fraud collateral or extraneous to the terms of the agreement. *See United States Reg'l Econ. Dev. Auth., LLC v. Matthews*, No. 16-CV-01093 (CSH), 2017 WL 5992384, at *7 (D. Conn. Dec. 4, 2017) (citing *Bridgestone/Firestone, Inc.*, 98 F.3d at 20). Thus, to maintain a fraud claim in conjunction with a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.*, 98 F.3d at 20.

Defendants argue that Citibank fails to make a showing under any of the three ways set forth above and thus Citibank's fraud claims, *i.e.*, Counts I (Fraudulent Misrepresentation), II (False

Pretenses), III (Actual Fraud – Misrepresentations), and IV (Actual Fraud – Fraudulent Conduct), must be dismissed as duplicative of Plaintiff's breach of contract claim (Count VI). (*See* Mot. at 10-14.) Relatedly, Defendants argue that Count V (Civil Conspiracy) must also fail if the court finds that none of Citibank's fraud claims can survive. (*Id.* at 14-15.)

Citibank argues that the Defendants' fraudulent conduct was extraneous to the contract and thus its fraud claims are separate from its breach of contract claim. (*See* Opp. at 16-17.) Citibank argues that the Friedmans' fraud "went beyond the mere breach of the promise to pay" as the Friedmans purported to make payments with third party bank accounts they did not own, that did not exist, and for payor accounts they did own but then disputed the authorization of those same payments with the payor bank once the account closing date had passed. (*Id.* at 16; Am. Compl. ¶ 24.) Citibank argues that because the credit agreements do not speak to issues of payments using unauthorized accounts, payment disputes with payor banks, or improper manipulation of payments and account closing dates to obtain credit beyond the contractual amount, the fraud alleged is extraneous to performance under the Credit Agreements. (Opp. at 17.)

Under the collateral or extraneous exception of the *Bridgestone/Firestone* analysis, "[m]isrepresentations made after a contract is entered into which relate to a present fact that would exist if the contract were performed, are collateral or extraneous to the contract . . . and are actionable in fraud." *Jordan (Bermuda) Inv. Co., Ltd.*, No. 00-CV-9214 (RWS), 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003).

The Amended Complaint alleges that at the time the Defendants entered into their Citibank credit agreements, and for the next few years, they "were good customers, honored their agreements, and made timely payments under their Credit

Agreements on their Credit Accounts." (Am. Compl. ¶¶ 8-9.) Following the contracts' formation, however, "Defendants embarked on a fraudulent scheme to drastically increase and swiftly charge up the balances of their Credit Agreements before Citibank could identify their illicit manipulations." (*Id.* ¶ 10.) In doing so, Defendants repeatedly made false representations to Citibank and payor banks, through false payment disputes, with fake payment account numbers/accounts, and manipulative tactics to prevent account aging. (*Id.* ¶ 24.)

Defendants argue that these allegations arise out of the same facts as the breach of contract claim and are thus insufficient to survive the instant motion to dismiss. (*See* Reply at 9.) However, the relevant question is not simply whether the allegations arise out of the same facts, but whether the allegations are extraneous to the contract. And construing the facts in Plaintiff's favor, Plaintiff does not only allege that Defendants entered into the contract while misrepresenting their intent to perform as agreed, (*see* Am. Compl. ¶ 20), but additionally alleges that, after the contracts were entered into in 2014 and 2015, Defendants repeatedly misrepresented "present facts" concerning their performance under the Credit Agreements on numerous occasions between 2017[5] and 2019. (*See* Am. Compl. ¶¶ 21-24; *see also* Opp. at 5 (alleging that the Friedmans opened the nine Credit Accounts with Citibank in 2014 and 2015).) Here, by actively representing that Defendants were making payments under the contract for consumer use, as well as disputing and authorizing charges that permitted them to exceed their credit limits, these allegations rise to the level of ongoing misrepresentations of present facts that are extraneous to the Credit Agreements. *See Jordan*, 2003 WL 1751780, at *8; *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520-21 (S.D.N.Y. 2016).

---

[5] The earliest date by which this court has found the alleged conduct timely. *See* section III.A.

16

The court therefore concludes that the alleged fraud on the basis of these misrepresentations is collateral to the Credit Agreements. As Plaintiff's fraud claims survive on this basis, the court declines to dismiss the civil conspiracy count. (*See* Mot. at 14 (arguing that Plaintiff's civil conspiracy count must fail in the event the fraud claims fail because liability based on conspiracy must be based on an independent underlying tort).) *See also Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 481 (E.D.N.Y. 1998), *aff'd*, 205 F.3d 1327 (2d Cir. 2000) ("[U]nder New York law, civil conspiracy to commit fraud, standing alone, is not actionable if the underlying independent tort has not been adequately pleaded"); *Philip S. Schwartzman, Inc. v. Pliskin, Rubano, Baum & Vitulli*, 187 N.Y.S.3d 702, 707 (N.Y. App. Div. 2d Dep't 2023).

Accordingly, Defendants' Motion to Dismiss Plaintiff's fraud and civil conspiracy claims as duplicative is DENIED.

### 2. Unjust Enrichment Claim

As with the fraud claims, the court finds no material difference in the laws of New York and South Dakota with respect to the coexistence of unjust enrichment and breach of contract claims. Under both laws, the first consideration is whether the contracts expressly cover the subject-matter alleged in an unjust enrichment claim. *See Redwing Constr. Co. v. Sexton*, 120 N.Y.S.3d 215, 219 (N.Y. App. Div. 3d Dep't 2020) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim"); *Johnson v. Larson*, 779 N.W.2d 412, 416 ("[T]he equitable remedy of unjust enrichment is unwarranted when the rights of the parties are controlled by an express contract").

If it is determined that the subject matter comprising the unjust enrichment claim is separate and distinct from the contract, then both states adopt nearly identical tests for plaintiffs seeking to prove an unjust enrichment claim exists: (1) that the defendant

benefitted; (2) at the plaintiff's expense; and (3) that it would be inequitable to allow defendant to retain the benefit without paying for it. *Compare Hofeldt v. Mehling*, 658 N.W.2d 783, 788, *with Freedom Holding, Inc. v. Haart*, 172 N.Y.S.3d 873, 888 (N.Y. Sup. Ct. 2022).

As such, the court will apply New York law to Plaintiff's unjust enrichment claim.

The only argument Plaintiff advances in arguing that its unjust enrichment claim should survive separate from its breach of contract claim is that "Citibank continued to suffer damages after the credit agreements terminated when payments were returned due to Friedman's [conduct]" and thus where there is a "bona fide dispute as to whether a relevant contract exists or overs the disputed issue," its unjust enrichment claim must survive. (Opp. at 18 (citing *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 471 (S.D.N.Y. 2014).)

However, in the singular case Plaintiff uses to support its argument, the district court held that while it is unclear at the motion to dismiss stage whether the express warranty applied to the facts as alleged, the court nevertheless declined to hold that the parties' pleadings "suggest a bona fide dispute about the *existence* of the express warranty." *Marshall*, 51 F. Supp. 3d at 472 (emphasis added).

The plain language of the Credit Agreements indicates that the contract covers conduct and transactions posted after the termination of Defendants' accounts. (*See* Credit Agreements at 7 ("If we close or suspend your Account, or if you close your Account, *you must pay us all amounts you owe on the Account . . . even if they post to your Account after it's closed or suspended.*") (emphasis added).)

Nonetheless, even taking Plaintiff's argument that it *might* be unclear whether the Credit Agreements cover the Defendants'

18

conduct following Citibank's termination of the contracts, there can be no dispute about the existence of the Agreements and that they prohibited improper, non-consumer use. (*See generally* Credit Agreements.) Indeed, where Citibank's breach of contract claim seeks to recover the same amount (inclusive of the payments returned after the Credit Accounts were closed), the court concludes that Plaintiff's unjust enrichment claim must be dismissed as duplicative of its conventional contract claim. (Am. Compl. ¶¶ 96-118.) *See Marshall*, 51 F. Supp. 3d at 472; *Bristol Vill., Inc. v. La.-Pac. Corp.*, 916 F. Supp. 2d 357, 367 (W.D.N.Y. 2013) (dismissing plaintiff's unjust enrichment claim where "there [was] no bona fide dispute about the existence of the express warranty, only the validity of the limitation on the amount of recovery stated therein").

Accordingly, Defendant's Motion to Dismiss Plaintiff's unjust enrichment claim is GRANTED.

### C. Failure to State a Claim

Defendants also separately argue that Plaintiff's Amended Complaint must be dismissed because it fails to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. 16-20.)

In support, Defendants point to the Credit Agreements which state that Citibank "may authorize Transactions that cause your balance to exceed your credit limit." (Credit Agreements at 2.) Defendants further argue that because Citibank allowed and authorized Defendants to overcharge their accounts, Citibank cannot now "twist[] the facts to allege fraud." (Mot. at 18-19.)

The court finds that Plaintiff has sufficiently pled facts sufficient to withstand dismissal under Rule 16(b)(6). Taking all the allegations in the Amended Complaint as true, it is more than reasonable to infer that Citibank authorized transactions that exceeded the Credit Account limits through fraud and that it was

the Defendants intent to misrepresent facts to induce Citibank to continuously authorize Defendants' transactions. However, it is highly unlikely that Citibank's agreements contemplated authorization of fraudulent conduct. *See J.A.O. Acquisition Corp.*, 745 N.Y.S.2d at 638-39. Defendants dispute the entirety of Plaintiff's complaint arguing none of the transactions were fraudulent, and instead an attempt to criticize and re-cast Defendants' spending habits as fraud. (Mot. at 19.) However, such arguments dispute the underlying facts, not the sufficiency of the allegations, and are thus improper considerations on a motion to dismiss.

The Defendants' Motion to Dismiss the Plaintiff's Amended Complaint for failure to state a claim is therefore DENIED.

## IV. CONCLUSION

For the reasons set forth above, the court GRANTS in part and DENIES in part Defendants' Motion to Dismiss the Amended Complaint. Plaintiff's claims to the extent they concern Defendants' conduct prior to March 29, 2017 are barred by the statute of limitations and therefore DISMISSED; Plaintiff's unjust enrichment claim is DISMISSED; all other claims remain. The parties are DIRECTED to contact the chambers of Magistrate Judge Robert M. Levy regarding next steps in the case.

SO ORDERED.

Dated:   Brooklyn, New York
         August 15, 2024

                                          s/Nicholas G. Garaufis
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge

20